**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
Trenton R. Kashima (SBN 291405)
19800 MacArthur Blvd., STE 270
Irving, CA 92612
Tel: 212-946-9389
tkashima@brysonpllc.com

*Counsel for Plaintiffs*

*[Additional Counsel Listed On Signature Page]*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN DIFALCO and MARTIN CONTRERAS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>SPIGEN, INC.,<br><br>        Defendant. | **Case No.: _____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ian DiFalco and Martin Contreras ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, brings this class action Complaint against Defendant Spigen, Inc. ("Spigen" or "Defendant"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. This case concerns Defendant's use of website tracking technologies and Defendant's representations to website visitors regarding those technologies. Plaintiffs allege that Defendant represented that visitors could control whether their data would be collected and shared, including by declining non-essential cookies, while continuing to transmit visitors' information to third parties despite those selections.

2. Spigen operates a commercial website, https://www.spigen.com/ (the "Website"), through which visitors learn about Spigen's consumer electronics accessories, including protective cases, screen protectors, chargers, mounts, and related products for smartphones, tablets, laptops, and wearable devices; create and manage visitor accounts; purchase products and related services; access customer support, warranty services, and product information; and explore promotional offers and marketing materials. Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") purporting to give visitors meaningful control over what data the Website collects from them and/or discloses to third parties via software-based monitoring systems embedded on the Website (the "Tracking Tools"). Defendant's Cookie Banner assures visitors that they may decline the use of cookies.

*Figure 1 – Cookie Banner displayed on Spigen's Website representing that visitors could "Accept" or "Decline" the use of Cookies*

3.      Defendant's representations are false and misleading. The Website deploys the Tracking Tools, including cookies, the moment a visitor lands on any page, well before the visitor can view or act upon the Cookie Banner. The Website then transmits visitor data via the Tracking Tools to the third-party tracking entities who, upon information and belief, include Meta, Platforms Inc. ("Meta," formerly known as Facebook, Inc.), Google LLC ("Google"), and the Microsoft Corporation ("Microsoft") (collectively referred to herein as the "Tracking Entities"), and additional advertising technology partners. The Tracking Tools, including cookies and proprietary retargeting pixels, track visitors' browsing activities, Website interactions, inputs, device information, session data, and unique identifiers across the Website the moment visitors interact with the Website, load webpages, or engage in other communications or events being monitored by the Tracking Tools that otherwise trigger the interception, copying, and transmittal of visitors' communications and information to the Tracking Entities. Worse still, even after visitors affirmatively decline all cookies, the Website continues to deploy the Tracking Tools, which intercept and transmit visitors' data to the Tracking Entities.

4.      Spigen's Cookie Banner deceives visitors by (1) placing the Tracking Tools on visitors' browsers, allowing the Tracking Entities to intercept visitors' communications with the Website before visitors have the ability to interact with the Cookie Banner, and (2) continuing to use the Tracking Tools (that intercept and transmit visitor data to the Tracking Entities) even after visitors decline all non-

essential cookies. Spigen's Website design and procurement of the Tracking Entities and Tracking Tools to monitor, intercept, and transmit visitor data constitute illegal wiretapping, unauthorized placement of a trap and trace and pen register device, invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism misleads Website visitors into reasonably believing that they have a meaningful choice and deprives them of control over their personal information.

5. The Tracking Tools collect detailed interaction and behavioral data, including visitors' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on visitor behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of visitors across sessions and websites, visitors' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this browsing activity, page interaction, device identifier, and persistent identifier information shared through the Tracking Tools is referred to as "Sensitive Information.".

6. In short, the Website's Cookie Banner materially misleads visitors about its use of cookies. Defendant lulls visitors into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit visitors' online behavior in real time. Such conduct deprives visitors of control over their Sensitive Information and violates fundamental privacy protections.

7. Plaintiffs visited Defendant's Website for consumer browsing purposes, including Plaintiff DiFalco's visit in or about March 2024 and Plaintiff

CLASS ACTION COMPLAINT

Contreras's visit in or about March 2025. During those visits, Plaintiffs browsed product offerings available on the Website. Each Plaintiff engaged with the Website's cookie consent mechanism and clicked "Decline," to decline all non-necessary cookies. In reliance on Defendant's representations, Plaintiffs believed that the Website would modify its behavior to honor their choices and disable marketing and tracking technologies beyond those strictly necessary for basic functionality. Instead, Defendant continued to provide access to Plaintiffs' browsing activity, page interactions, navigation patterns, cookie identifiers, and device identifiers to the Tracking Entities for advertising and analytics purposes. Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiffs' Sensitive Information, private communications, invade Plaintiffs' fundamental right to privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so, Defendant violated the federal Wiretap Act 18 U.S.C. § 2510, et seq. ("Wiretap Act"), California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping), § 638.51 (unlawful use of a pen register or trap and trace device), California's Consumer Legal Remedies Act Cal. Civ. Code §§ 1770, et seq. ("CLRA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL"); as well as common-law prohibitions against, *inter alia*, intrusion upon seclusion, fraud and deceit, unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated visitors harmed by Defendant's deceptive and unlawful conduct.

## JURISDICTION AND VENUE

8.        This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act,

28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

9. This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintain its principal place of business in this District.

10. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

11. Plaintiff Ian DiFalco is a citizen and resident of New Jersey since April 2025. Prior to that, Plaintiff DiFalco was a citizen and resident of the Commonwealth of Pennsylvania. Plaintiff DiFalco accessed and used the Website while physically located in Pennsylvania. Plaintiff visited the Website in or about March 2024 for consumer browsing purposes. During that visit, Plaintiff browsed product offerings available on the Website. Plaintiff does not maintain an account with Defendant. Plaintiff DiFalco previously made a purchase of Defendant's products in or about January 2024 through Amazon, rather than directly through the Website. Plaintiff DiFalco consistently declines non-essential cookies on all websites he visits as a matter of personal-privacy practice. In connection with his visit to Defendant's Website, Plaintiff DiFalco engaged with the Cookie Banner and declined all cookies, relying on Defendant's representations that such selection would disable cookies. Plaintiff DiFalco accessed the Website while logged into his Facebook account, a social networking website owned and operated by Meta, and reasonably believed that by rejecting non-essential cookies, his browsing activity

would not be tracked beyond what was strictly necessary for the Website's basic functionality. Plaintiff more recently visited the Website on February 20, 2026, as part of counsel's investigation, which confirmed that utilizing Defendant's Cookie Banner to verify the declining of cookies did not disable the Tracking Tools. Despite Defendant's assertions to the contrary, choosing to decline all cookies did not disable all the Tracking Tools. Some of the Tracking Tools, including those from Google, continued to monitor Plaintiff after he chose to reject non-essential cookies. As a result of Defendant's implementation of the Tracking Tools on the Website, and Defendant's fraudulent statements in the Cookie Banner, Plaintiff's Sensitive Information, including browsing activity, cookie identifiers, and device identifiers, was intercepted and recorded by certain Tracking Tools and Tracking Entities.

12. Plaintiff Martin Contreras is, and at all relevant times has been, a citizen and resident of California. Plaintiff Contreras accessed and used Defendant Spigen's Website while physically located in California. Plaintiff Contreras visited the Website in or about March 2025 for consumer browsing purposes. During that visit, Plaintiff Contreras browsed product offerings available on the Website. Plaintiff Contreras does not maintain an account with Defendant. Plaintiff Contreras previously made a purchase of Defendant's products in or about 2021. Plaintiff Contreras consistently declines the use of cookies on all websites he visits as a matter of personal-privacy practice. In connection with his visit to Defendant's Website, Plaintiff Contreras engaged with the cookie consent mechanism and declined cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Contreras accessed the Website while logged into his Facebook account and reasonably believed that by rejecting non-essential cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Defendant's assertions to the contrary, choosing to decline cookies did not disable all the

Tracking Tools. Some of the Tracking Tools, including those from Google, continued to monitor Plaintiff Contreras after he chose to reject non-essential cookies. As a result of Defendant's implementation of the Tracking Tools on the Website, and Defendant's fraudulent statements in the Cookie Banner, Plaintiff Contreras's Sensitive Information, including browsing activity, cookie identifiers, and device identifiers, was intercepted and recorded by certain Tracking Tools and Tracking Entities.

13. Defendant Spigen, Inc. is in the business of developing, marketing, selling, and supporting consumer electronics accessories, including protective cases, screen protectors, chargers, mounts, and related products and services, throughout the United States. Defendant operates its business primarily through direct-to-consumer sales and digital platforms under the Spigen brand, including the Website. Spigen, Inc. provides centralized product design and development, e-commerce services, marketing, customer support, logistics coordination, and operational oversight for its product offerings. Spigen, Inc. centrally operates, controls, and supports the marketing, distribution, and commercial operations of its products and services to consumers nationwide, including through digital platforms such as the Website. Spigen, Inc. is incorporated under the laws of the State of California and maintains its principal place of business at **9975 Toledo Way, Suite 100,** Irvine, California, United States.

## FACTUAL ALLEGATIONS

**A. How Websites Function**

14. In general, websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a visitor's internet browser, as the browser loads and processes the website's code to display the webpage.

15.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

16.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

17.     When a visitor navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that visitor's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

18.     An IP address is "a unique address that identifies a device on the internet or a local network."[4] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

19.     When a visitor's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues a response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan 07, 2026).

[2] *Id.*

[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan 07, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan 07, 2026).

small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the visitor's browser.[5]

20.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

21.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[7]*

22.     Website owners or web developers write and manage the URLs for their websites.

23.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

24.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and

---

[5] *Id.*

[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[7]     *What      is      a      URL?*,      MOZILLA,      https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan 07, 2026).

[8] *Id.*

electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

25.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[12]*



*Figure 4 – Sample webpage used to demonstrate a webpage URL*

[9] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan 07, 206).

[10] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan 07, 2025).

[11] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan 07, 2025).

[12] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Dec. 22, 2025).



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 3)*

*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

26.    After the visitor sends the Request URL, the server sends the HTTP Response to the visitor, and the visitor's browser assembles the HTTP Response packets into the source code of the webpage. The webpage code is then processed by the visitor's browser, as it arrives,[13] and "rendered" into a visual display according to the instructions of the HTML, CSS, and JavaScript code.[14] This is the visible, and usually interactable, website that most people think of.

27.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML computer programming languages such as JavaScript snippets, which are embedded or called within the HTML code.[15]

28.    Such complex tasks include monitoring and reporting visitor activity.

29.    In short, the Internet relies on a constant back-and-forth stream of requests being sent between the visitor and servers. These requests serve as a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware a user accesses a website.

30.    Unbeknownst to visitors, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up visitors' communications with the Website.

**B.    Defendant Programmed the Website to Include the Tracking** Tools

31.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into the Website's programming. Defendant's use of Tracking

---

[13] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[14] *How the web works?*, MOZILLA, How_the_web_works (last visited Jan 09, 2025).

[15] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan 07, 2026).

Tools on the Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities.

32. The Website, by using the Tracking Tools, causes visitors' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by the Tracking Entities' and Website's servers to a visitor's web browser and stored locally on the visitor's device. Targeting, analytics, and advertising cookies typically contain unique identifiers that enable a website to recognize and differentiate individual visitors. These cookie files are automatically harvested by the Tracking Tools and transmitted back to web servers through HTTP requests when visitors trigger the Tracking Tools, allowing the Website and Tracking Entities to identify the device and visitor communicating with the Website and to record how the visitor interacts with the Website.

33. First-party cookies are those placed directly on the visitor's device by the Website, which the visitor is knowingly communicating with. First-party cookies are commonly used to recognize visitors across repeated visits to the same website and to track their on-site activity.

34. Third-party cookies are placed by third-party servers, not the Website, such as google.com, facebook.com, and other advertising or analytics domains. When a visitor's browser loads a webpage containing embedded Tracking Tools, the Tracking Entities' scripts determine whether their cookies already exist on the visitor's device and, if not, cause those cookies to be created and stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual visitors across different websites, including the Website, and across multiple browsing sessions.

35. As detailed further below, Tracking Tools, including cookies, that are placed on visitors' devices during interactions with the Website are subsequently used to intercept and record visitors' communications by the Tracking Entities,

enabling them to surreptitiously track and collect Website visitors' Sensitive Information in real time.

36. Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring visitor engagement and Website performance; (ii) personalization, including remembering visitor preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on visitor profiles; and (iv) social media integration. Ultimately, cookies enable Defendant and the Tracking Entities to enhance revenue and marketing effectiveness through the collection, analysis, and dissemination of visitor data.

37. Defendant owns and operates the Website, which allows visitors to view and learn about Spigen's consumer products, such as phone cases, create and manage visitor accounts, purchase products, access product information and customer support, and explore promotions and marketing offerings. When visitors interact with the Website by navigating pages, clicking links, entering data, or submitting information, they communicate directly with Defendant.

38. Defendant chose to integrate the Tracking Tools into the Website. As a result, when visitors visit the Website, both first-party and third-party cookies are placed on visitors' devices and/or transmitted to Tracking Entities' servers. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded, Defendant controls which Tracking Tools are implemented and how they are configured, including whether visitor data is transmitted to Tracking Entities.

39. Defendant explains its use of third-party cookies on the Website's Cookie Banner by stating, in substance, that they may use cookies to "ensure you get the best experience."[16] The Cookie Banner itself says nothing about third parties and their cookies being used to track visitors.

---

[16] Spigen's Cookie Banner as it appeared on March 2, 2026

40.    Defendant's Privacy Policy[17] represents that some "cookies" are used to enhance the shopping experience for visitors by personalizing their experience:

"We also use "cookies". Cookies are small data text files that your web browser stores on your computer when you visit some web sites. We use cookies to make your online shopping experience easier and more personalized, for instance, allowing you to retrieve an earlier shopping cart. Please note that your web browser must be set to accept cookies before you can place an order at the Site. If you wish to deny the use and saving of cookies from the Site on to your computer's hard drive you should take necessary steps within your web browser's security settings to block all cookies from the Site."[18]

41.    Defendant provides additional disclosures regarding its use of third-party cookies in its Privacy Policy. In the section addressing "How We Use The Information Collected" Defendant informs visitors that it uses certain third parties providing advertising and analytics services[19]:

"Below is a list of third-party platforms we use with a short explanation of why we use them and their associated Privacy Policies:

Google Analytics - We use Google Analytics to better understand audience behavior on our websites and to help us improve the visitor experience. We do not use personally identifiable data through this service.

Google Adwords - We utilize Google Adwords and other similar Google services for advertising purposes, which includes remarketing through the use of cookies (see Section 7 of this policy for more information on how we use cookies).

Facebook - We utilize Facebook for advertising purposes, which includes remarketing through the use of cookies (see Traffic Date, Cookies and Their Use for more information on how we use cookies). We do not use personally identifiable data through this service.

Instagram - We utilize Instagram for advertising purposes, which includes remarketing through the use of cookies (see Traffic Date, Cookies and Their Use for more information on how we use cookies). We do not use personally identifiable data through this service."

---

[17] Spigen, *Privacy*, https://www.spigen.com/pages/privacy (last visited Jan 07, 2026).
[18] *Id.*
[19] *Id.*

42. Defendant's privacy policy is misleading and actively deceives visitors. While Defendant informs visitors that they work with third party platforms, it never informs them that the third-party platforms, including the Tracking Entities, set their own cookies through the Tracking Tools. It never informs visitors that the Tracking Tools intercept visitors' communications with the Website and transmit them to the Tracking Entities

43. Additionally, the Privacy Policy claims that Defendant does not use personally identifiable data through Facebook.[20] This is false. These disclosures do not inform users that third-party tools intercept communications in real time or continue operating after opt-out.  As detailed below, Meta's tracking pixel ("the Meta Pixel") transmits the c_user cookie to Meta. This cookie personally identifies visitors on the Website.

**C.    Defendant Falsely Informed Visitors That They Could Opt Out of the Website's Use of Cookies**

44. When visitors visited the Website, the Website immediately displayed a pop-up Cookie Banner. The Cookie Banner presented visitors with the option to accept or decline cookies.



*Figure 7 – Cookie Banner of Spigen representing visitors with option to "Accept" or "Decline" cookies*

---

[20] Spigen, *Privacy*, https://www.spigen.com/pages/privacy (last visited Jan 07, 2026).

45.    After visitors chose to decline all cookies the Cookie Banner disappeared. Visitors were free to continue browsing the Website.

46.    Defendant's Cookie Banner led Plaintiffs, and all Website visitors similarly situated, to believe that they had successfully rejected all cookies. The Cookie Banner further reasonably led visitors to believe that Defendant would not allow Tracking Entities to use cookies to intercept visitors' Sensitive Information with the Website.

47.    These representations were false. In reality, Defendant did not abide by visitors' expressed preferences. When visitors chose to decline all cookies, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools, including cookies. Nevertheless, Defendant continued to cause the Tracking Tools, specifically those from the Tracking Entities, to be placed on visitors' browsers and devices, which facilitated the interception of visitors' Sensitive Information by the Tracking Entities.

48.    Certain aspects of the operation of cookies and Tracking Tools on the Website can be observed using website developer tools that log network traffic transmitted to and from a visitor's device while interacting with the Website.

49.    Network traffic logs generated through such tools reveal HTTP requests and transmissions between visitors' browsers and multiple Tracking Entities while visitors visit and interact with the Website.

*Figure 8 – Screenshot depicting Developer Tool on visitor's browser showing network activity for Google Tracking Tools intercepting search queries*



*Figure 9 - Screenshot depicting Developer Tool on visitor's browser showing the payload activity Google third-party cookies*



*Figure 10 - Screenshot depicting Developer Tool on visitor's browser showing Google third-party cookies*



*Figure 11 - Screenshot depicting Developer Tool on visitor's browser showing Microsoft third-party cookies*

*Figure 12 - Screenshot depicting Developer Tool on visitor's browser showing Facebook third-party cookies*

50.    These network logs demonstrate that, even after visitors declined cookies, visitors' browsers continued to send HTTP requests to Tracking Entities containing cookies to track visitors.

51.    Through these ongoing transmissions, Website visitors' Sensitive Information, were surreptitiously disclosed to Tracking Entities. These Tracking Tools enable Tracking Entities to track visitors across websites, and over time, correlate visitor behavior with other datasets, and compile detailed visitor profiles reflecting visitors' preferences, behaviors, demographics, and inferred

characteristics. These profiles are monetized for advertising, analytics, and marketing purposes by Defendant and Tracking Entities.

52. The Tracking Tools that Defendant caused to be loaded and executed by visitors' browsers function as unlawful wiretaps because they enable Tracking Entities, who are not parties to the communications, to eavesdrop on, record, extract, analyze, and exploit visitors' Sensitive Information. These Tracking Entities are not mere passive tools or instruments of the Defendant; they independently collect and use the intercepted communications for their own commercial purposes, in addition to benefits provided to Defendant.

**D.     Defendant's Website Uses Tracking Tools to Spy on Visitors**

53. Defendant operates the Website and has installed on the Website software created by Tracking Entities. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

54. The Tracking Tools collect information about visitors' site activity when events specified by the Defendant, like viewing a specific webpage, are triggered. Defendant determines just how much data is collected by the Tracking Entities, and how specific that data is, which can be seen in the parameters included in the detailed URLs and the metadata found in the payload of HTTP Requests.

55. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[21] URL parameters include key-value pairs formatted as "key=value":

    a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

---

[21] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Jan 07, 2026).

b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a visitor taking the action of adding a product to their online shopping cart)



*Figure 13 - Diagram of a URL displaying how parameters function[22]*

---

[22] *Id.*

CLASS ACTION COMPLAINT

*Figure 14 – Sample product on the Website*

### a.    The Meta Pixel

56.    Meta offers its own tracking pixel (the "Meta Pixel") to website owners for the purpose of monitoring visitor interactions on their websites, which can then be shared with Meta.

57.    The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business

account or link a related Facebook account with its Pixel and then add code to the website to make use of the Pixel.[23]

58.      Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[24] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[25]

59.      This Pixel ID must match "a known Pixel ID" in Meta's system,[26] and is transmitted by the Meta Pixel.[27]

60.      As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[28]

61.      The Meta Pixel is employed by Defendant to gather, collect, and then share visitor information with Meta.[29] Receiving this information enables Meta and Defendant to build valuable personal profiles for Website visitors to inform their

---

[23] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Dec. 22, 2025).
[24] *Id.*
[25] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan 07, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[26] *Meta Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan 07, 2026)
[27] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan 07, 2026).
[28] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan 07, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[29] The Facebook Pixel allows websites to track visitor activity by monitoring visitor actions ("events") that websites want tracked and share a tracked visitor's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan 07, 2026).

targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting visitors into paying customers.[30]

62.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[31]

63.    Once implemented on a website, the Meta Pixel begins to share visitors' information the moment a visitor lands on the website.

64.    When a Facebook account holder logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the visitor's device.[32] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.

65.    The c_user cookie, for example, contains a series of numbers (the visitor's Facebook ID, or "FID") to identify a visitor's profile.

c_user=10009195985O832;

*Figure 15– Sample c_visitor cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

66.    The FID can simply be appended to www.facebookcom/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 15*, appending it to the Facebook URL in a standard internet browser (here,

---

[30] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan 07, 2026).
[31] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan 07, 2026).
[32] *Cookies Policy: What are cookies, and what does this* policy cover?, *Facebook* (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan 07, 2026).

26
CLASS ACTION COMPLAINT

www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:



*Figure 16 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

67.       The Meta Pixel tracks visitor-activity on web pages by monitoring events,[33] which, when triggered, causes the Meta Pixel to automatically send data – here, visitors' Sensitive Information – directly to Meta.[34] Examples of events utilized by websites include: (i) a visitor loading a page with a Pixel installed (the "PageView

---

[33]       *About   Meta   Pixel*,   FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan 07, 2026).

[34] *See generally id.*

event");[35] (ii) when a visitor views pre-designated content, like products for sale (the "ViewContent" event);[36] (iii) when a visitor clicks a pre-designated button, like "Add to Cart" (the "SubscribedButtonClick" event); and (iv) when a visitor adds a product to their shopping cart (the "AddToCart" event, collectively with PageView event, ViewContent event, and SubscribedButtonClick event, the "Pixel Events").[37] The Website utilizes all four Pixel Events.[38]

68.    Defendant's use of the Meta Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel ID of "746038908836489".

69.    Defendant and Meta's use the Meta Pixel to monetize Website visitors' Sensitive Information.

70.    Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Through the use of visitors' Sensitive Information, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers. Defendant then makes use of Meta's refined marketing profiles to target visitors with advertising.

71.    Defendant's concealed use of the Meta Pixel on the Website is demonstrated by the screenshots below, which follow a visitor's journey to purchasing the sample product on the Website from *Figure 14*.

---

[35]    *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Dec. 22, 2025).

[36]    *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Dec. 22, 2025).

[37] *Id.*

[38] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Dec. 22, 2025).



*Figure 17 – Meta Pixel tracking a visitor landing on the webpage from Figure 14 through the "AddToCart" event*

*Figure 18 – Meta Pixel tracking a visitor landing on the webpage from Figure 14 through the "ViewContent" event*



*Figure 19 – Meta Pixel tracking a visitor landing on the webpage from Figure 14 through the "PageView" event*

*Figure 20 – Meta Pixel tracking a visitor landing on the webpage from Figure 14 through the "SubscribedButtonClicked" event*

72.    When a business applies with Meta to use the Meta Pixel, it is provided details about its functionality, including with respect to private information.[39]

73.    To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

74.    The Meta Terms inform website owners using Meta's Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Pixel Event information and contact information.[40]

75.    The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs, as well as to combine those visitor IDs with corresponding [Pixel Event information]."[41]

76.    Meta directs parties implementing the Meta Pixel -here, Defendant - to encrypt request information[42] *before* data can be shared.[43]

77.    Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

78.    Meta educates or reminds Meta Pixel users, such as Defendant, of their responsibility to inform their visitors of their website's data sharing practices

[39] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan 07, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook Visitor accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[40] *Meta BusinessTools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan 07, 2026).

[41] *Id.*

[42] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes visitors' information visible. *See id.*

[43] *Id.*

and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any Tracking Entities.[44]

79.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its visitors' data and to warn its visitors that the Website would disclose information in a manner that threatened visitors' Sensitive Information.

**b.    *Google Tracking Tools***

80.    Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

**1.    *Google Ads***

81.    Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web visitors.[45]

82.    The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the visitor's search results;[46] (iii) Google then allows advertisers to bid on those various keywords;[47] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search

---

[44] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan 07, 2026).

[45] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Jan 6, 2026).

[46] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Jan 07, 2026).

[47] *Id*.

results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

83.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[48] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

84.    AdSense for content or AdSense for search are methods by which AdSense functions.[49] In either configuration, AdSense matches advertisements to website visitors based on the content of the website and visitor activity.

85.    Google Ads intercepted Plaintiffs' viewing activity, as depicted below, using the sample webpage for "airpods pro 3 series case rugged armour" on the Website. This interception occurred through visitors' browsers, similar to the Facebook Pixel, as communications were sent and/or received on visitors' devices.

---

[48] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan 6, 2026).

[49]    *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan 07, 2026).

*Figure 21 – Test search made on the Website resulted in sharing Content Views with Google Page Ads*

86.      Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

87.      Through Google AdSense, Google aggregates viewing data collected from website visitors. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in visitor behavior, Google gains insight into what visitors view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

88.      Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[50] Google uses data on how visitors interact with websites to train its algorithms to provide more accurate and relevant search results.[51] For example, when a visitor clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that

---

[50] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan 07, 2026).
[51] *Id.*

visitor's interests. By aggregating such data across visitors, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[52]

89.    Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a visitor clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate visitor viewing data allows Google to further tailor its products to advertisers and visitors by training its algorithms on large volumes of data.

### 2.    *Google Analytics*

90.    Like the Meta Pixel, Google Analytics ("GA") collects data about visitor interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[53]

91.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[54] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[55]

---

[52] *Id.*

[53] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan 07, 2026).

[54]    *About    the    Google    tag*,    GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan 07, 2026).

[55] *Id.*

92.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

93.    Here, Defendant added GA to the Website. That implementation caused Plaintiffs' webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:



*Figure 22 – Test search made on the Website resulted in sharing search terms with Google Analytics*

94.    After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

### c.      *Microsoft Universal Event Tracking*

95.      Microsoft offers Microsoft Advertising (formerly known as "Bing Advertising"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests.[56]

96.      One of the software tools available through Microsoft Advertising is Universal Event Tracking ("UET"), which allows website owners, like Defendant, to allow Microsoft to track conversion events on a website, target specific audiences and automate advertisement bidding.[57]

97.      UET is a tag that is placed on a website. Once UET is installed, the tag reports all user activity on the website to Microsoft Advertising.[58]

98.      UET uses several cookies which it stores or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a global unique ID assigned to a visitor's browser that identifies them,[59] the _uetsid cookie, which contains a session ID, and the _uetvid, which contains a unique ID for a unique website visitor.[60]

99.      UET can collect vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address is always passed to Microsoft with every http request from UET. UET can also collect:

- Event actions
- Event categories
- Event types

---

[56] *Bing Ads API Overview* https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last accessed on February 25, 2026)

[57] *What is UET and how can it help me?* https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last accessed on February 25, 2026)

[58] *What is UET and how does it related to conversion tracking and remarketing features?* https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last accessed on February 25, 2026)

[59] *Guid Struct* https://learn.microsoft.com/en-us/dotnet/api/system.guid?view=net-10.0 (last accessed on March 3, 2026)

[60] *What cookies does UET use?* https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last accessed on February 25, 2026)

- Browser language setting

- Page URLs

- Referrer URLs

- Screen height

- Session ID

- The UET tag ID

- A signed-in user ID

- A visitor ID[61]

---

[61] *What data does UET collect once I install it on ym Website?* https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last accessed on February 25, 2026)

CLASS ACTION COMPLAINT

100.      Defendant's use of UET on the Website can be seen in the figures below.



CLASS ACTION COMPLAINT

| Query String Parameters | View source | View URL-encoded |
| --- | --- | --- |
| ti | 17535836 | |
| Ver | 2 | |
| mid | 1631de56-73ff-404c-9a9c-424867653e96 | |
| bo | 3 | |
| sid | 1b65d980020e11f190e6c9d05d6f0964 | |
| vid | 1b6662c0020e11f1bcb8cd75dd388e73 | |
| vids | 0 | |
| msclkid | N | |
| uach | pv=19.0.0 | |
| pi | 918639831 | |
| lg | en-US | |
| sw | 1920 | |
| sh | 1080 | |
| sc | 24 | |
| tl | AirPods Pro 3 Case Rugged Armor - Spigen.com Official Site – Spigen Inc | |
| p | https://www.spigen.com/products/airpods-pro-3-series-case-rugged-armor | |
| r | | |
| evt | pageLoad | |
| sv | 2 | |
| asc | G | |
| cdb | AQAQ | |
| rn | 452148 | |

*Figure 23 – Test search made on the Website resulted in sharing search terms with UET*

101. Microsoft informs websites using UET that they are responsible for managing visitor consent. Websites are instructed to place the "_uetmsdns" cookie as a first-party cookie and set the value to 1 to stop events from firing and respect visitor consent choices, should they not accept the use of trackers.[62]

102. Defendant failed to place this cookie on the Website and failed to stop UET events from firing when visitors declined the use of cookies.

**E.     The Tracking Tools are Pen Registers or Trap and Trace Devices**

103. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted

---

[62] *How can I stop UET events from being fired for users who request to restrict data sharing?* https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last accessed on February 25, 2026).

by an instrument or facility from which a wire or electronic communication is transmitted, but such information does not include the contents of any communication." Cal. Penal Code § 638.50(c).

104. California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but such information does not include the contents of any communication." Cal. Penal Code § 638.50(b).

105. The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by visitors, who are never informed that the Website is collaborating with the Tracking Entities to obtain their IP address and other identifying information. As such, it is a "trap and trace" device. *See Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 930 (C.D. Cal. 2025).

106. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, it is designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' device to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' device.

107. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

108. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2; *see*

*Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

109.    Defendant did not obtain Plaintiffs' or the Class members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did the Defendant obtain a court order.

**F.    Defendant Violated CIPA § 631 by Intercepting the Contents of Plaintiffs' Communications**

110.    CIPA § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024). Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts. *Id.*

111.    Courts analyze claims under CIPA § 631 using the same framework applied to claims under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

### a.    *Defendant Procured Tracking Entities to Intercept the Contents of Communications in Transit*

112.    Under federal and California wiretap law, the "contents" of a communication refer to the intended message conveyed by the communication, not merely record or routing information generated incidentally. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

113. Transmitted URLs that include both the path and query string reflect the substance of a visitor's communication and therefore constitute contents. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

114. Here, the network requests intercepted by the Tracking Entities included Request URLs containing the names of the webpages that visitors viewed on the Website.

115. The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiffs' browser and continued to transmit data at the moment Plaintiffs submitted information through the Website.

116. This interception, duplication, and transmission occurred inside Plaintiffs' browser, before the communications reached their intended destination, and therefore occurred while the communications were in transit. *See Esparza v. UAG Escondido A1 Inc.*, No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

117. The Tracking Entities were third parties to Plaintiffs' communications with the Defendant and used the contents of Plaintiffs' and the Class members' communications to build marketing profiles of them in real time.

118. Defendant's deployment of the Tracking Tools enabled those Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA § 631.

### b. *Defendant Aided and Abetted Third-Party Interceptions*

119. A party violates CIPA § 631 not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to

wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

120. Defendant knowingly embedded and configured the Tracking Tools in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

121. Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications.

122. Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

### c. Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls

123. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin immediately, before visitors had any opportunity to review or act upon the Cookie Banner.

124. As a result, visitors were tracked as soon as they landed on the Website home page, without prior consent.

125. Plaintiffs visited the Website while those default tracking settings were active.

126. Visitors who visit the Website are shown a Cookie Banner offering the option to decline cookies.



*Figure 24 – The Cookie Banner shown to visitors who visit the Website*

127. Despite those representations, even visitors who declined all unnecessary cookies continued to be tracked by Facebook, Google, and Microsoft cookies.

128. Representations regarding cookie-consent controls are materially misleading where tracking continues despite visitors' opt-out selections.

129. Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[63]

130. The Tracking Entities independently benefit from the interception of communications by using data collected through the Tracking Tools to improve their own advertising products and to market those capabilities to other businesses.[64]

## CLASS ALLEGATIONS

131. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class:

> All visitors who visited and interacted with the Defendant's Website in the United States during the applicable limitations period and whose electronic communications were intercepted or disclosed through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

Plaintiff Contreras brings this class action individually and on behalf of the following California Subclass:

> All visitors who visited and interacted with the Defendant's website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted,

---

[63] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan 07, 2026);

[64] *See Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan 07, 2026).

disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "California Subclass").

132.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

133.    Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

134.    NUMEROSITY: The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, the Class members number in the thousands. The precise number or identification of members of the Class is presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records. The Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

135.    COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

        a.    Whether Defendant shared Class members' Sensitive Information with the Tracking Entities or other third parties;

b.      Whether Defendant obtained effective and informed consent to do so;

c.      Whether Class members are entitled to statutory penalties; and

d.      Whether Class members are entitled to injunctive relief.

136.    TYPICALITY: As a person who visited Defendant's Website and whose Sensitive Information was shared by the Defendant, Plaintiffs are asserting claims that are typical of the Class.

137.    ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

138.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, the Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### *FIRST CAUSE OF ACTION*
**Intrusion Upon Seclusion**
**(On behalf of Plaintiffs and the Class)**

139.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

140.    Plaintiffs bring this cause of action on behalf of themselves and all Class members.

141. The tort of intrusion upon seclusion requires (a) an intentional intrusion into a place, conversation, or matter as to which the plaintiffs had a reasonable expectation of privacy, and (b) that the intrusion be highly offensive to a reasonable person.

142. By causing the Tracking Tools to be placed on visitors' browsers and devices and by transmitting visitors' Sensitive Information to Tracking Entities despite visitors' opt-outs, Defendant intentionally intruded upon the solitude and seclusion of Plaintiffs and Class members.

143. Plaintiffs and Class members had an objectively reasonable expectation of privacy in their Sensitive Information with the Website because Defendant represented that visitors could opt out of non-essential cookies and Tracking Tools, and because California law protects such communications.

144. Defendant's intrusion, placing Tracking Tools and enabling Tracking Entities' access to visitors' Sensitive Information despite visitors' express rejection of such tracking was highly offensive to a reasonable person.

145. As a direct and proximate result of Defendant's intentional intrusion, Plaintiffs and Class members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

### SECOND CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(On behalf of Plaintiff Contreras and the California Subclass)**

146. Plaintiff Contreras incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

147. Plaintiff Contreras brings this cause of action on behalf of himself and all California Subclass members.

148. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious

threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

149. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

150. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

151. In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. Ribas v. Clark, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

152.   The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

153.   Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Contreras and the Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of the Defendant. Within the relevant time period, the Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

154.   Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

155.   Plaintiff Contreras and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

### THIRD CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act Cal. Penal Code § 638.51**
**(On behalf of Plaintiff Contreras and the California Subclass)**

156.   Plaintiff Contreras incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

157. Plaintiff Contreras brings this cause of action on behalf of himself and all California Subclass members.

158. California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

159. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

160. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." California Penal Code § 638.50(c).

161. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

162. California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a).

163. No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by the Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture the IP addresses, email, routing, addressing, and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

164. The Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff Contreras's and the California Subclass members' activity on the Website.

165. The Defendant did not obtain consent from Plaintiff and the California Subclass members before using pen register or trap and trace technology to identify visitors of its Website and has violated Section 638.51.

166. As a direct and proximate result of Defendant's conduct, Plaintiff Contreras and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

### *FOURTH CAUSE OF ACTION*
**Violation of the Federal Wiretap Act 18 U.S.C. § 2510, et seq.**
**(On behalf of Plaintiffs and the Class)**

167. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

168. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

169. The federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

170. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

171. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

172.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

173.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

174.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

175.    Defendant is a "person" within the meaning of the Wiretap Act.

176.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

177.    Plaintiffs had a reasonable expectation of privacy in their electronic communications with the Defendant's Website, including their searches, browsing activity, and order-related interactions, particularly where the Defendant represented through its Cookie Banner, that visitors could  decline the use of cookies.

178.    The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting visitors' choices, intent, and behavior on a commercial website such as searches, menu selections, and order interactions, are sensitive and convey the substance and meaning of the communication.

179.    A reasonable visitor is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require visitors to assume their privacy will be violated as a matter of course.

180. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website.

181. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing Plaintiffs' Sensitive Information, including for combining that information with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

182. Interception occurred whenever Plaintiffs interacted with the Website, including when he navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through his browser.

183. At all relevant times, the Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of visitors' communications to Tracking Entities.

184. Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined non-essential tracking through Defendant's Cookie Banner.

185. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

186.    Defendant intentionally intercepted the contents of Plaintiffs' and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state.  For example, Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, and associating the content of Plaintiffs' and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiff and the Class members on its Website.

187.    Additionally, the interception of Plaintiffs' communications was fraudulently used based off misrepresentations to Plaintiffs through the Cookie Banner.

188.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

189.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

    a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

    b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c.    reasonable attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
**Common Law Fraud, Deceit and/or Misrepresentation**
**(On behalf of Plaintiffs and the Class)**

190. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

191. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

192. Defendant made affirmative representations to visitors through its Cookie Banner that visitors could decline all non-essential cookies.

193. Defendant represented that exercising this option would limit or prevent the deployment of non-essential Tracking Tools, including targeting and analytics cookies, and would stop the transmission of visitors' browsing activity, interactions, and related data to the Tracking Entities.

194. Defendant made these representations at the time visitors first accessed the Website.

195. These representations were false and misleading. After visitors, including Plaintiffs, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit visitor data to Tracking Entities.

196. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to visitors' expressed privacy choices.

197. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when visitors declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or

condition the loading of non-essential tracking technologies based on visitor preferences, and Defendant could have implemented such measures.

198. Defendant made misrepresentations with the intent to induce reliance by visitors, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for their own commercial benefit.

199. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

200. Plaintiffs' reliance was reasonable because Defendant presented the Cookie Banner and as mechanism for exercising legally protected privacy rights and for controlling the collection and sharing of Sensitive Information.

201. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their Sensitive Information, and diminution in the value of their personal data.

202. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize visitors' data despite representing that such practices would cease upon opt-out.

203. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiffs and the Class)

204. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

205. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

206. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

207. Defendant's retention of those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to visitors and without valid consent is unjust.

208. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

## SEVENTH CAUSE OF ACTION
### Violation of the California Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1770, et seq. ("CLRA")
### (On behalf of Plaintiff Contreras and the California Subclass)

209. Plaintiff Contreras incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130 as though fully set forth herein.

210. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

211. Defendant is a person under the CLRA.

212. Plaintiff Contreras is a consumer of Defendant's products under the CLRA, as Plaintiff Contreras purchased one of Defendant's products.

213. Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

214. By this failure to disclose, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

215. By this failure to disclose, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

216. Defendant's failure to disclose was material to Website visitors such as Plaintiff Contreras. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

217. Defendant undertook deceptive acts or practices, in violation of the CLRA, by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

218. By this fraud, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

219.    By this fraud, Defendant violated section 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

220.    Plaintiff Contreras and the California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

***EIGHTH CAUSE OF ACTION***
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")**
**(On behalf of Plaintiff Contreras and the California Subclass)**

221.    Plaintiff Contreras incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 14 through 130  as though fully set forth herein.

222.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

223.    By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendant has violated the unlawful prong of the UCL.

224.    By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

225.    By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

226.    By actively and fraudulently deceiving visitors about its ability to disable the Tracking Tools, Defendant has violated the unlawful prong of the UCL.

227.    Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed visitors' personal identifying information without

knowledge or consent. Defendant disclosed visitors' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping visitors' communications with the Website. Defendant fraudulently deceived visitors about its ability to disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

228. Plaintiff Contreras has standing to bring claims against Defendant under the UCL. Plaintiff Contreras's information was tracked and recorded without consent. Plaintiff Contreras's data was used to build personal profiles for advertising purposes without consent.

229. Plaintiff Contreras would have considered it important to the decision to visit Defendant's Website to know that his data was being tracked and recorded without his consent.

230. Because of Defendant's UCL violations described above, Plaintiff suffered injury by losing control of his personal data and having his Sensitive Information tracked and recorded without his consent.

231. Plaintiff Contreras and the California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## **PRAYER**

WHEREFORE, Plaintiffs pray for the following relief against Defendant:

      a.    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representative of the Class and Subclass and their counsel as Class Counsel;

      b.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

      c.    For an order finding in favor of Plaintiffs, the Class, and Subclass on all counts asserted herein;

d.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website visitors;

e.    An award of statutory damages or penalties to the extent available;

f.    For damages in amounts to be determined by the Court and/or jury;

g.    For pre-judgment interest on all amounts awarded;

h.    For an order of restitution and all other forms of monetary relief;

i.    Reasonable attorneys' fees and costs; and

j.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.

Dated: March 25, 2026

**BRYSON HARRIS SUCIU & DeMAY PLLC**

By: */s/ Trenton R. Kashima*
Trenton R. Kashima (SBN 291405)
19800 MacArthur Blvd., STE 270
Irving, CA 92612
Tel: 212-946-9389
tkashima@brysonpllc.com

Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mjensen@zlk.com

*Counsel for Plaintiff*
*pro hac vice* forthcoming

CLASS ACTION COMPLAINT